### KELL et al. v. GROSS et al.
#### No. 12337.

United States Court of Appeals
Fifth Circuit.

Jan. 11, 1949.

Rehearing Denied Feb. 21, 1949.

---

716

Leslie Humphrey, of Wichita Falls, Tex., and Eugene DeBogory, of Dallas, Tex., for appellants.

James E. Henderson, of Dallas, Tex., for appellees.

Before HUTCHESON, SIBLEY, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

The appellees recovered judgment for $118,353.69 and interest on a contract for the purchase by them of the entire capital stock of the Missouri and Arkansas Railway Co., to be paid out of a fund deposited by appellants under the contract in the hands of Republic National Bank. The petition in its first count was founded on the exhibited contract. In the second count it alternatively alleged a precedent verbal agreement which by accident or mistake was deviated from in writing the contract and a reformation was prayed. The answer in effect alleged there was no agreement except the writing, that it was the contract, and that its terms precluded the recovery sought. Much evidence was introduced as to the negotiations, covering several weeks, and the drafting of the writing carefully and deliberately, there being present Gross, who is one of the purchasers, his attorney, the attorney of the other purchaser and a public accountant on behalf of the purchasers, and on behalf of the sellers, one Bullington, who is the husband of one of them and is a lawyer, and wrote the preliminary draft of the contract, and the husband of another seller, who was the president of the Railway Company. The writing was signed by the two purchasers and later by one of the eight sellers who held a formal power of attorney from the other seven. The district judge found no accident or mistake and adjudged no reformation, but construed the contract to mean what the petitioners asserted it meant.

On this appeal it is not contended that anything was mistakenly put into or left out of the contract. Neither side insists that the contract is even ambiguous. But they differ as to its meaning. We also see no evidence of accident or mistake. The writing was deliberately adopted by all parties as the expression of their contract. All previous negotiations are merged into it. Each party must be held to its provisions. The interpretation of its terms is merely a question of law. The finding of the district judge as to its meaning is not a fact finding, but a conclusion of law.

The contract, dated November 15, 1946, covers twenty-six printed pages, but the controversy is limited to the provisions about a deposit in escrow of $245,000 in the bank, and especially Paragraphs 5 and 6. In interpreting these paragraphs, however,

all the provisions of the contract are to be considered in arriving at the true meaning expressed. So doing, it appears from the introductory clauses that the sellers, eight sisters, own the entire 3500 shares of the stock of the Railway Company, the interest of each being set forth, and individually and severally each is selling her stock. They agree to sell for an aggregate sum of $645,000, the stock to be delivered at once at the Republic National Bank, of which price $400,000 is to be paid cash to their attorney in fact, and the remainder, $245,000 is to be held by the bank in escrow "to accomplish the purposes and fulfill all the obligations and agreements of stockholders as hereinafter set forth", it representing a deposit by each stockholder of her part in it. It is next agreed that the stockholders will cause retirement of the present directors and officers of the Railway Company and fill the vacancies with persons named by the purchasers, thus giving full control of the Railway Company. The stockholders next represent and declare to be true a number of facts, and especially that an attached balance sheet of the company as of the close of business September 30, 1946 (Exhibit B), is correct, with seven exceptions, the last being "Assets and liabilities unknown at this time". The balance sheet shows what we may term the fixed assets, such as road and equipment and rolling stock and miscellaneous physical property, with no bonds or fixed liabilities. It shows separately under the heading "Current Assets", such fluctuating items as Cash, Traffic and Car Services, Balances Receivable, and Material and Supplies, to a total of $206,902.36; and as "Current Liabilities", such as Car Service Balances, Wages Payable, Accounts Payable, and Tax Liability, to a total of $325,827.54. Then comes Paragraph 5, which we regard as the heart of this controversy, from which we quote significant passages with emphasis added:

"The statement at the close of business September 30, 1946, Exhibit B hereto attached, shows as of that date *an excess* of current liabilities over current assets in the sum of $118,925.18. The stockholders and purchasers recognize that if there be an increase in current liabilities or a de-crease in current assets or both, from September 30, 1946, to the date of this agreement, November 15, 1946, effecting an increase in the amount of current liabilities *in excess* of current assets hereinbefore set forth, viz. $118,925.18, or if after Nov. 15, 1946, unknown and undisclosed liabilities or deferred liabilities for any contract or tort entered into or committed by the Railway Company prior to November 15, 1946, shall *increase such excess* of liabilities over assets recovered, the value of the stock in the Railway Company will be diminished and impaired, and the stockholders are willing to grant and recognize that Purchaser is *entitled to protection, indemnity*, and *reimbursement* from and for any such *diminution* or *impairment in the* value of *such stock*. Accordingly each of the stockholders agrees for herself and not for the others to *exonerate, indemnify and hold harmless* Purchaser against such stockholder's proportionate share (determined as hereinafter provided) of any and *all loss, damage* and *injury* which Purchaser may suffer or incur by reason of the fact *that current liabilities exceed current assets in a sum greater than $118,925.18.*" A balancing provision follows, that if similarly the excess of $118,925.18 is diminished, the Purchaser will on demand pay into the escrow deposit of the stockholders an amount equal to the saving.

Then comes Paragraph 6, on which appellants specially rely: "Purchaser agrees to either pay or see to it that the Missouri and Arkansas Railway Co. forthwith *pays and satisfies* the vouchers which have been issued by said Railway Company and which are *listed as current liabilities* in Exhibit B, and *when same are paid* and proper evidence of their payment is presented to stockholders' representative hereinafter named, he and Purchaser shall authorize the holder of the escrow fund to *reimburse Purchaser forthwith* from said escrow fund, *as provided in Paragraph 5 hereof.* The above mentioned current liabilities shall in any event be paid or caused to be paid by Purchaser on or before six months from the date of this agreement, and *if Purchaser is entitled to any reimbursement under the terms of Paragraph 5* hereof, stockholders agree to cause same to be

made from said escrow fund forthwith after proper evidence is presented to their representatives that Purchaser is *entitled to be indemnified and reimbursed as provided in Paragraph 5 hereof."* Then follow similar agreements as to any payments of unknown and undisclosed claims if stockholder's representative agrees that they are vaild.

Paragraph 7 is mainly for the direction and protection of the Bank as escrow agent, and it states that the escrow fund is "security for and to make effective the warranty protection and indemnities set forth in Paragraphs 5 and 6 above." It adds nothing here material, nor does any of the succeeding 13 paragraphs.

The petitioning purchasers rest their case on the provisions of Paragraph 6, asserting that they have paid $118,925.18 over and above the current assets of the Company and are entitled to be reimbursed forthwith from the sellers' $245,000 held in escrow as security. But Paragraph 6 refers repeatedly to Paragraph 5, and expressly limits its own operation by the words "If Purchaser is entitled to any reimbursement under the terms of Paragraph 5." Referring to the quotations from Paragraph 5, it is perfectly clear that it was concerned with an *increase* or *decrease* in *the excess* of current liabilities over current assets of the Company supposed to be $118,925.18, on which figure the trade was made. The purchasers were agreeing to pay $645,000 for the stock if the excess of current liabilities of the Company over its current assets did not turn out to be more than the exhibited statement showed. If that figure proved correct, they were entitled to no reimbursement; the Company's condition was as represented. If Section 6 were read literally by itself, without reference to Paragraph 5, every vouchered liability which Purchaser paid or had the Company to pay would be entitled to be reimbursed forthwith out of the escrow fund, even without regard to the current assets. Reading it with Paragraph 5, as we must, we think it abundantly clear that no reimbursement is due until current liabilities are paid, not only in excess of current assets, but in excess of the debit balance between them of $118,925.18 which the statement of Sept. 30, 1946, showed, and

which was in effect warranted to be correct and made the basis of adjustments in the price of the stock.

The judgment is reversed and the cause remanded with direction to enter judgment in accordance with this opinion.

Reversed with direction.